Betty CAVENY, Administrator of the
Estate of Linda Masur, et
al., Plaintiffs,

v.

RAVEN ARMS COMPANY, Defendant.

No. C–1–86–0032.

United States District Court,
S.D. Ohio, W.D.

May 22, 1987.

Eugene Rothchild, Cincinnati, Ohio, for plaintiffs.

Bruce M. Allman, Cincinnati, Ohio, for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS.

SPIEGEL, District Judge:

This matter came on for consideration of defendant's motion for judgment on the pleadings (doc. 5), plaintiffs' memorandum in opposition (doc. 16), defendant's reply memorandum (doc. 18), plaintiffs' motion for leave to amend their complaint (doc. 17) and defendant's memorandum in opposition (doc. 21).

Initially, we grant plaintiffs' motion for leave to amend their complaint. Defendant claims its motion for judgment on the pleadings only relates to the claims in plaintiffs' original complaint. Defendant indicates it will respond to the additional claims raised in plaintiffs' amended complaint only if we grant plaintiffs leave. However, this will not be necessary. We construe defendant's motion for judgment on the pleadings, its reply brief and its memorandum in opposition to plaintiffs' motion to amend,[1] to challenge plaintiffs' claims in both the original and amended complaint for failure to state a claim for relief. Reading defendant's motions and memorandum together as a motion for judgment on the pleadings, we find that plaintiffs have failed to state a claim for relief.

## BACKGROUND

Plaintiffs, the administrator of the estate of Linda Masur and Linda Masur's surviving daughter, Margaret Lynn Masur, brought this action to recover from defendant Raven Arms Company for damages they sustained in connection with the death of Linda Masur. Plaintiffs seek to impose strict liability upon Raven Arms because it allegedly manufactured and marketed a .25 caliber handgun used to murder Linda Masur.

In their original complaint plaintiffs alleged two theories of strict liability: (1) defendant engaged in an ultrahazardous activity when it manufactured the Saturday Night Special, and (2) the Raven Arms handgun is a Saturday Night Special. In their amended complaint, plaintiffs alleged the following additional theories of liability: (1) defendant defectively designed, manufactured and distributed the handgun for some unlawful purpose; (2) the handgun was intentionally designed and manufactured to be marketed and distributed to persons whom Raven Arms knew would primarily use the handgun for unlawful purposes; (3) defendant acted negligently

or grossly negligent, and in willful and wanton disregard of the consequences of its conduct in the manufacture and distribution of the handgun; and (4) defendant is an accessory before the fact under Ohio law for the murder of Linda Masur and is a civil aider and abetter to the wrongful death of Linda Masur. For the following reasons we find that each of plaintiff's theories fails to state a claim for relief. We shall address each theory in turn.

■ In this diversity action we are bound to apply the law of the courts of Ohio. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When a state's highest court has not yet ruled on an issue, federal courts must determine from the available case law what the state law is and then apply it. *Bailey v. V & O Press Co., Inc.,* 770 F.2d 601 (6th Cir.1985); *Sours v. General Motors Corp.,* 717 F.2d 1511, 1514 (6th Cir.1983); *Clutter v. Johns-Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir.1981). As will become apparent, we shall confront issues in deciding the instant case that are not yet resolved by the Supreme Court of Ohio.

### A. *Manufacture and Distribution of a Handgun is an Ultrahazardous Activity*

■ Plaintiffs seek to impose strict liability on defendant on the grounds that the manufacture and distribution of the handgun at issue are ultrahazardous activities. Along with other courts considering this issue, we reject plaintiffs' theory.

Ohio courts have long imposed absolute liability on persons engaging in ultrahazardous activities even when due care has been exercised. *Taylor v. Cincinnati,* 143 Ohio St. 426, 435, 55 N.E.2d 724 (1944). However, the activities recognized as ultrahazardous are limited to those activities that pose a danger to persons in close proximity to the activity such as blasting, storing water and storage of explosives. *See Walczesky v. Horvitz Co.,* 26 Ohio St.2d 146, 269 N.E.2d 844 (1971); *Louden*

---

1. Defendant objects to plaintiffs' motion to amend their complaint on the basis of futility. In so objecting, defendant essentially has chal-

lenged plaintiffs' new allegations for failure to state a claim for relief.

*v. Cincinnati*, 90 Ohio St. 144, 106 N.E. 970 (1914). In this way, the ultrahazardous activity doctrine, as defendant points out, is narrow in scope. Hence, in the handgun context, it is the actual use, not the manufacture or marketing, of a handgun that is ultrahazardous.

Furthermore, among the criteria for determining whether an activity is ultrahazardous is the requirement that the activity not be a matter of common usage. *See Moore v. R.G. Industries*, 789 F.2d 1326 (9th Cir.1986); Restatement (Second) of Torts § 520 (1965). Without a doubt manufacturing and distributing handguns is a matter of common usage. Indeed, approximately two million handguns are sold annually. Note, "Handguns and Products Liability," 97 *Harv.L.Rev.* 1912, 1923 (1984). Most courts considering this issue have declined to impose strict liability on the manufacturer of handguns on this theory. *See Moore v. R.G. Industries*, 789 F.2d 1326 (9th Cir.1986); *Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1268 (5th Cir.1985), *rev'g Richman v. Charter Arms Co.*, 571 F.Supp. 192 (E.D.La.1983); *Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200, 1203–4 (7th Cir.1984); *see also Riordan v. International Armament Corp.*, 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293 (1985); *Trespalacious v. Valor Corp.*, 486 So.2d 649 (Fla.1986). The only Ohio court we have found to address this specific issue is in agreement with the aforementioned cases. *See Francis v. Diamond International Corp.*, No. CV82–11–1279 and CV83–02–0215 (Butler Co.Ct. of Com.Pl., March 22, 1983), *aff'd* No. CA84–09–111 (Butler Co.Ct.App. Dec. 30, 1985) [Available on WESTLAW, OH–CS database], mo. to certify overruled, No. C5A86–343 (Ohio S.Ct. May 28, 1986). After this decision was affirmed by the Butler County Court of Appeals, the Ohio Supreme Court declined to certify it for review. Hence, this claim is dismissed.

B. *Defective Design and Manufacturer of Handguns*

■ At oral arguments, plaintiffs contended that the handgun in this case is defective since its risks far outweigh its utility. Plaintiffs correctly assert that Ohio has adopted the defectiveness standard articulated in section 402A of the Restatement (Second) of Torts, comment g (1965). *See Cremeans v. International Harvester Co.*, 6 Ohio St.3d 232, 234, 452 N.E.2d 1281 (1983); *Knitz v. Minster Machine Co.*, 69 Ohio St.2d 460, 432 N.E.2d 814 (1982); *see also Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 573 P.2d 443, 143 Cal.Rptr. 225 (1978). In adopting this standard the Ohio Supreme Court in *Knitz*, 69 Ohio St.2d at 465, 432 N.E.2d 814, clarified that a product design is defective if it fails to conform to consumer expectations or if the benefits of the design do not outweigh its risks. Plaintiffs place their reliance on the risk/utility prong of this standard.

To engage in this balance *Knitz* suggests that the following factors be considered: "likelihood of injury, the gravity of the danger posed, and the mechanical and economic flexibility of an improved design." *Id.* at 466, 432 N.E.2d 814. This criteria is flexible and the analysis will vary with the facts of each case. *Cremeans*, 6 Ohio St.3d at 234–5, 452 N.E.2d 1281.

Plaintiffs maintain that the risks associated with the handgun manufactured in this case are extensive, while the benefits are almost nonexistent. Plaintiffs argue that the only possible function this handgun could serve is self-protection since it would be inappropriate for any other legitimate purpose such as military use, law enforcement, hunting and target shooting. Moreover, plaintiffs maintain that they have evidence to show that this type of handgun virtually is useless for self-defense. Thus, plaintiffs maintain this raises a question of fact for jury determination.

Even if plaintiffs can produce such evidence, we find that the risk/utility theory of liability is inappropriate in this case. This standard is only applicable in situations in which a product has functioned improperly, not when products have functioned as intended. For instance, in *Cremeans*, 6 Ohio St.2d at 232, 452 N.E.2d 1281 a tractor that slipped off a trailer and

overturned did not have roll-over protection. Similarly, in *Knitz*, 69 Ohio St.2d at 460, 432 N.E.2d 814, a punch press lacked safety guards. In both of these cases, the products operated improperly due to design inadequacies. Here, by contrast, the handgun operated as intended; when fired a bullet struck an individual in its path. In other words, the risk/utility test is only proper when the product could be made safer through an alternative design and not when the product is by its nature dangerous. Other courts considering this issue are in agreement. *See Francis v. Diamond International Corp.*, Nos. CV82–11–1279 and CV83–02–0215 (Butler Co.Ct. Com.Pls., March 22, 1983), *aff'd* CA84–09–111 (Butler Co.Ct.App. Dec. 30, 1985), mot. to certify overruled C5–86–343 (Ohio S.Ct. May 28, 1986). *See also Patterson v. Rohm Gesellschaft*, 608 F.Supp. 1206 (N.D. Tx.1985); 97 *Harv.L.Rev.* 1912, 1915–16 (argues handgun manufacturers should not be liable under defective design and distribution theories). *But see* Turley and Harrison, "Strict Tort Liability of Handgun Suppliers," 6 *Hamline L.Rev.* 285 (1983) (supports liability based on risk/benefit analysis).

Although plaintiffs have not briefed nor orally argued this theory, we also find that the first prong of the *Knitz* test, the consumer expectation standard, could not be used to classify the handgun in this case defective. Needless to say, on the facts as alleged the gun here operated in a fashion that a rational consumer would expect. Hence, this claim fails under both prongs of the *Knitz* test and thus, is dismissed.

### C. *Defective Distribution of a Nondefective Product*

■ Plaintiffs also claim that the defendant's manner of distributing its handgun is defective. To support is theory plaintiffs rely on *Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759 (1977). There the Michigan Supreme Court ruled that a product may be flawed by a defect in distribution. In *Moning*, a slingshot manufacturer was held liable for injuries resulting from a child's misuse of its product. The Court held that if a jury found that the risk of selling slingshots to young children outweighed the utility of allowing children to have slingshots, the manufacturer could be held liable for any resulting injuries. *Id.* at 434, 254 N.W.2d 759. The *Moning* Court found that the method of distribution can make it easy for potential misusers to purchase slingshots. This decision, however, has been expressly rejected by at least one court. *See Bojorquez v. House of Toys, Inc.*, 62 Cal.App.3d 930, 933, 133 Cal.Rptr. 483, 484 (1976). No cases have been brought to our attention in which an Ohio court has recognized a claim for defect in distribution.

Even if we accept the decision in *Moning*, however, the facts in that case easily are distinguished from the facts of the case at bar. The *Moning* Court noted that at times different rules are applicable to children since they are more inclined to act without regard to known risks. *Id.* 400 Mich. at 445, 254 N.W.2d 759. Since children are readily identifiable, methods of distribution can be designed to prevent the sale of inherently dangerous items to children. *Id.* In contrast, it is more difficult to conceive of a method of distribution by which handgun manufacturers could avoid the sale of its product to all potential misusers. Hence, even applying the Court's holding in *Moning*, we conclude that it does not dictate liability in the case before us. This claim is dismissed.

### D. *"Saturday Night Special" Liability*

■ Plaintiffs also assert a claim for strict liability on the theory that the handgun in this case is a "Saturday Night Special." Plaintiffs chiefly rely on the Maryland Court of Appeals' opinion in *Kelley v. R.G. Industries*, 304 Md. 124, 497 A.2d 1143 (1985). To our knowledge this is the only decision imposing liability on manufacturers for injuries resulting from the criminal use of handguns.

The *Kelley* Court was only willing to impose liability on the manufacturers of a category of handguns identified as "Saturday Night Specials." The salient characteristics of a Saturday Night Special are

that it is short barrelled, inexpensive, poor quality, easily concealed, inaccurate and unreliable. 497 A.2d at 1153-54. Because of such characteristics, the Court found that the Saturday Night Special is only appealing to individuals with a criminal purpose, since the gun has no value for legitimate purposes such as for law enforcement, sports, and personal protection. 497 A.2d at 1154. Since the Saturday Night Special is frequently used in the commission of crimes, manufacturers know or should know their guns will be used for criminal purposes. Consequently, the Court reasoned that manufacturers who profit from the sale of these guns should assume the costs of resulting injuries. 497 A.2d at 1158.

The Kelley Court found support for this reasoning in its interpretation of the public policy expressed in both federal and state legislation. According to the Court, Congress through the Gun Control Act of 1968, expressed its disapproval of Saturday Night Specials by banning the importation of such handguns from other countries. 497 A.2d at 1154. In addition, since state laws indicate that there are only two legitimate purposes for handguns, sport and self-protection, the Court found that the Maryland legislature implicitly disapproves of handguns only useful for criminal activity. 497 A.2d at 1157-58.

In light of this expressed public policy and the frequent criminal use of these particular handguns, the Court found it appropriate to hold both manufacturers and marketers of Saturday Night Specials strictly liable to innocent persons injured through the criminal use of these products. The Court noted that a difficult aspects of deciding these cases will be determining when a handgun can be classified as a Saturday Night Special since there is no fixed definition. 497 A.2d at 1159. Once a Court makes a preliminary finding, however, this issue becomes a factual matter for jury determination.

While acknowledging the ingenuity of the Kelley Court, we are not compelled to follow its holding or reasoning. By contrast, we find the analysis in Delahanty v.

Hinckley, Nos. 82-409 and 82-490 slip op. (D.C.D.C., Dec. 9, 1986), a decision of the District Court for the District of Columbia that rejected Kelley to be persuasive. Initially, the Court in Delahanty, slip op. at 24, recognized that inconsistent and unjust results would obtain by following the definition of a Saturday Night Special articulated in Kelley. While the Kelley Court's definition plainly excludes expensive handguns, the Delahanty Court notes that expensive guns may be even more dangerous due to their increased accuracy and reliability. Specifically, the Delahanty Court points out, a manufacturer of a cheaper handgun will be strictly liable for injuries resulting from the criminal acts of others even if it takes precautions to prevent the sale of its guns to misusers. Yet the manufacturer of a more expensive handgun will not be liable even if it makes no effort to prevent the sale of its wares to criminals. Id. at 25.

In our view the most compelling aspects of Delahanty is the Court's analysis of the impact of the Kelley holding on persons from low income areas. Id. at 25-27. The Kelley opinion makes numerous references to the fact that cheap handguns are most abundant in ghetto areas having the highest crime rates. The implicit assumption appears to be that residents of ghetto areas are more prone towards criminal activity. In response, the Delahanty Court cogently states:

> The fact is, of course, that while blighted areas may be some of the breeding places of crime, not all residents of are so engaged, and indeed most persons who live there are law abiding but have no other choice of location. But they, like their counterparts in other areas of the city, may seek to protect themselves, their families and their property against crime, and indeed, may feel an even a greater need to do so since the crime rate in their community may be higher than in other areas of the city. Since one of the reasons they are likely to be living in the 'ghetto' may be due to low income or unemployment, it is highly unlikely that they would have the resources or worth to buy an expensive handgun for self

defense. To remove cheap weapons from the community may very well remove a form of protection assuming that *all* citizens are entitled to possess guns for defense.

*Id.* at 26.

In response to plaintiffs' legislative policy arguments, the *Delahanty* Court stated that while federal laws limit the importation of Saturday Night Specials, other federal laws allow the importation of parts used to make such weapons in this country. *Id.* at 27. Consequently, the legislative policy expressed through this enactment cannot be said to condemn unequivocally the manufacture of these particular handguns.

Finally, even if Saturday Night Specials should be banned, the proper means of implementing such a prohibition is through the legislature and not the courts. Contrary to the Court in *Kelley*, we do not see this as a matter the courts should decide on a case-by-case basis. Legislatures, in contrast to courts, can consider all of the competing policy interests as well as the public will. Congress, in fact, has considered such legislation on various occasions. As one commentator recently noted: "In 1972, a ban was accepted by the Senate but refused by the House of Representatives; since then, bans have been proposed repeatedly in Congress and have consistently failed." Note, "Handgun Manufacturer Liability—*Kelley v. R.G. Industries,*" 9 *Harv.J.L. & Pub. Pol.* 764, 768 (1986).

Along with the Court in *Delahanty* we decline to engage in the judicial legislation of gun control measures. After considering Ohio's products liability laws, we have found nothing to convince us to reach an opposite conclusion. Hence, this claim is dismissed.

## D. *Civil Liability for Aiding and Abetting the Wrongful Death of Linda Masur*

█ Plaintiffs also assert claims not related to products liability law. These theories are based on criminal gun control laws and principles of civil aiding and abetting.

We find, however, these theories fail to state a claim for relief.

Plaintiffs claim that defendant knowingly facilitated criminal activity and thus participated in a pattern of corrupt activity. Ohio Revised Code § 2923.34 provides a means of civil redress to persons whose conduct violated section 2923.32 which provides, *inter alia*, that: "no person employed by, or associated with, any enterprise shall conduct or participate in directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity ..." § 2923.32(A)(1). Corrupt activities include, among other things, violations of sections 2923.12 (carrying a concealed weapon), 2903.02 (murder), and 2903.12 (assault).

Plaintiffs allege that the gun manufactured by defendant principally is designed for the commission of crimes. In addition, plaintiffs contend this handgun is a concealed weapon prohibited under section 2923.12. Consequently, plaintiffs' theory is that the design, manufacture and distribution of this gun constitute a violation of Ohio's weapon control act and make defendant an accessory before the fact or an aider and abettor in murder of Linda Masur.

This theory has serious flaws. Initially, we find that defendant has not violated any of Ohio's gun control laws by manufacturing the handgun at issue here. To begin with plaintiffs misconstrue Ohio Rev.Code § 2923.24. This section provides that it is a crime to possess or have under one's control any substance or instrument with the intent to use it criminally. However, it does not make it a crime to "provide" an instrument which is later used with criminal intent as plaintiff asserts. We reject the notion that the only intended purpose of this gun is criminal.

Further, plaintiff states that possession of a concealed weapon is prohibited under Ohio Rev.Code § 2923.12. However, plaintiffs do not go on to explain that it is lawful to carry a concealed weapon in certain situations under this provision. For instance, it is permissible to carry a concealed weapon for purposes of self-defense. Ohio Rev.Code § 2923.12(C)(1)(2), and (3).

Hence, even if this particular handgun would be classified as a concealed weapon, there are recognized lawful purposes for carrying such a weapon.

In addition, plaintiffs refer to Ohio Rev. Code § 2923.17 which prohibits any person from knowingly acquiring or carrying a dangerous ordnance. Pursuant to Ohio Rev.Code § 2923.11 dangerous ordnances include certain firearms such as machine guns. However, the legislature did not include in its definition small handguns such as the Saturday Night Special. Accordingly, we must assume the legislature did not intend to include this type of weapon within the definition of a dangerous ordnance.

Plaintiffs also refer to Ohio Rev.Code § 2923.20(A)(3) which provides that no person shall:

> Manufacturer, possess for sale, sell, or furnish to any person other than the law enforcement agency for authorized use in police work, any brass knuckles, cestus, billy, blackjack, sandbag, switch blade knife, spring blade knife, gravity knife, or *similar weapon.*

According to plaintiffs a "similar weapon" is any object which is easily concealable and primarily designed to injure people. This definition of "similar weapon" is patently overbroad. None of the weapons listed in this provision are firearms. Clearly, the legislature did not intend this provision to include handguns since it is not similar to the aforementioned weapons.

As indicated, plaintiffs rely on the Ohio RICO statute which includes civil remedial measures. Ohio Rev.Code § 2923.34. Initially, we note that this remedy is unavailable to plaintiffs since it only applies in situations in which one incident that is part of a pattern of corrupt activity occurred after the effective date of the statute in 1986. *See* Ohio Rev.Code § 2923.31(E). Since the murder of Linda Masur occurred in March 1985, plaintiffs cannot seek relief under this provision.

Plaintiffs maintain, nonetheless, that the statutory remedy is only a codification of preexisting law. Even reaching the merits of this claim, the manufacture of a handgun later used to commit a crime does not constitute a corrupt activity under Ohio Rev.Code § 2923.31. Further, plaintiffs allege that defendant is an accessory before the fact or an aider and abettor in criminal acts because it manufactured a handgun in violation of Ohio's gun control laws. We have already determined, however, that defendant has not violated any laws by the manufacture of this handgun. In both cases cited by plaintiffs, the defendants were held liable for another's misuse of a gun, because those defendants truly acted in contravention of then existing gun control laws. *See Taylor v. Webster,* 12 Ohio St.2d 53, 231 N.E.2d 870 (1967) (defendant negligent per se in allowing her son to use an air gun in violation of Ohio Weapon Control Act); *Neff Lumber Co. v. Bank Adm.,* 122 Ohio St. 302, 171 N.E. 327 (1930) (seller of shotgun held liable for injuries resulting from illegal sale of shotgun). Since we find the facts of this case clearly distinguishable, we dismiss this claim.

*E. Negligence*

Finally, plaintiffs allege that defendant acted negligently or grossly negligent and in willful and wanton disregard of the consequences of its conduct in the manufacturer and distribution of the handgun. We reject this claim summarily. Plaintiffs have alleged no facts whatsoever to support a claim that defendant acted negligently with respect to manufacturing its handgun. Plaintiffs' theory is that the mere act of manufacturing this handgun is negligent, not that it was manufactured improperly. By manufacturing and distributing the handgun in this case, defendants did not breach a duty to plaintiffs under Ohio law. This claim is also dismissed.

Accordingly, having found that none of plaintiffs' allegations state a claim for relief this case is dismissed.

SO ORDERED.