880 F.2d 830
 58 USLW 2142, 16 Media L. Rep. 2148
 Marjorie A. EIMANN, Individually, as Next Friend of Gary
Wayne Black, and as Representative of the Estate
of Sandra Kay Black, Deceased, and Glenn
G. Eimann, Plaintiffs-Appellees,
v.
SOLDIER OF FORTUNE MAGAZINE, INC. and Omega Group, Inc.,
Defendants-Appellants.
 No. 88-2499.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 17, 1989.
 
 Larry D. Thompson, Lance Olinde, Jr., Houston, Tex., E. Barrett Prettyman, Jr., Hogan & Hartson, William P. Flanagan, John G. Roberts, Jr., David G. Leitch, Washington, D.C., Robert Bruce Miller, Boulder, Colo., for defendants-appellants.
 John Roberson, Ronald G. Franklin, Deanna H. Livingston, Houston, Tex., for plaintiffs-appellees.
 Phelps, Dunbar, Marks, Claverie & Sims, Luther T. Munford, Jackson, Miss., Jack M. Weiss, New Orleans, Leonard H. Freiman, Falls Church, Va., Anne R. Noble, Baker & Hostetler, Bruce W. Sanford, Washington, D.C., for amicus curiae American Newspaper Publishers Ass'n.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GARWOOD, JOLLY and DAVIS, Circuit Judges.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 Soldier of Fortune Magazine, Inc. appeals a $9.4 million jury verdict against it in a wrongful death action brought by the son and mother of a murder victim. The jury found that Soldier of Fortune acted with negligence and gross negligence in publishing a personal services classified advertisement through which the victim's husband hired an assassin to kill her. We reverse the judgment entered on the jury's verdict.
 
 I. FACTS
 
 2
 John Wayne Hearn shot and killed Sandra Black at the behest of her husband, Robert, who offered to pay Hearn $10,000 for doing so. Robert Black contacted Hearn through a classified advertisement that Hearn ran in Soldier of Fortune Magazine, Inc. (SOF), a publication that focuses on mercenary activities and military affairs.
 
 
 3
 The ad, which ran in the September, October and November 1984 issues of SOF, read:
 
 
 4
 EX-MARINES--67-69 'Nam Vets, Ex-DI, weapons specialist--jungle warfare, pilot, M.E., high risk assignments, U.S. or overseas. (404) 991-2684.
 
 
 5
 Hearn testified that "Ex-DI" meant ex-drill instructor; "M.E." meant multi-engine planes; and "high risk assignments" referred to work as a bodyguard or security specialist. Hearn testified that he and another former Marine placed the ad to recruit Vietnam veterans for work as bodyguards and security men for executives. Hearn's partner testified that they also hoped to train troops in South America. This partner never participated in any ad-related jobs and quit the venture shortly after the ad first ran.
 
 
 6
 Hearn and his partner testified that they did not place the ad with an intent to solicit criminal employment. However, Hearn stated that about 90 percent of the callers who responded to the ad sought his participation in illegal activities including beatings, kidnappings, jailbreaks, bombings and murders. It also generated at least one lawful inquiry from an oil conglomerate in Lebanon seeking ten bodyguards; Hearn received a commission for placing seven men with the company.
 
 
 7
 Between early 1982 and January 1984, Black had asked at least four friends or coworkers from Bryan, Texas to kill Sandra Black or help him kill her. All four refused. Black called Hearn in October 1984 after seeing his ad in SOF.
 
 
 8
 Hearn testified that his initial conversations with Black focused on Black's inquiries about getting bodyguard work through Hearn. In later calls they discussed the sale of Black's gun collection to Hearn. Hearn testified that he traveled from his home in Atlanta to Black's home in Bryan on January 9, 1985 to look at Black's gun collection. Hearn stated that Black discussed his plans for murdering his wife during the meeting and "hinted" that he wanted Hearn to participate, but did not ask Hearn directly to kill his wife. Hearn did not act on the hint and returned to Atlanta.
 
 
 9
 Black called Hearn repeatedly after Hearn returned to Atlanta. During one call Black spoke with Hearn's girlfriend, Debbie Bannister. Hearn and Bannister met after she called him in response to his SOF ad.
 
 
 10
 Black proposed directly that Hearn kill his wife during the call to Bannister. She passed the proposal on to Hearn, who called Black and said he would consider doing it. The two talked by phone several times in the following weeks. After an aborted murder attempt about three weeks later--during which Hearn was to help Black himself kill his wife--Hearn killed Sandra Black on February 21, 1985. By that time Hearn also had killed the ex-husband of Bannister's sister on January 6, 1985 and Bannister's husband on February 2, 1985.
 
 
 11
 Neither Hearn, who was sentenced to concurrent life sentences for the murders, nor his partner had criminal records when they placed their ad in SOF. Neither had received a dishonorable discharge from the Marines. Further, Hearn included his real name and correct address in submitting the ad to SOF; the ad itself listed Hearn's correct home telephone number.
 
 
 12
 Sandra Black's son, Gary Wayne Black, and her mother, Marjorie Eimann, sued SOF and its parent, Omega Group, Ltd., for wrongful death under Texas law on the theory that SOF negligently published Hearn's classified ad.
 
 
 13
 Eimann introduced into evidence about three dozen personal service classified ads selected from the 2,000 or so classified ads that SOF had printed from its inception in 1975 until September 1984. Some ads offered services as a "Mercenary for Hire," "bounty hunter" or "mechanic"; others promised to perform "dirty work," "high risk contracts" or to "do anything, anywhere at the right price."
 
 
 14
 Eimann presented evidence that seven and perhaps as many as nine classified ads had been tied to crimes or criminal plots. Eimann introduced stories from sources including the Associated Press, United Press International, The Rocky Mountain News, The Denver Post, Time and Newsweek that reported on links between SOF classified ads and at least five of these crimes.
 
 
 15
 Eimann also presented evidence that law enforcement officials had contacted SOF staffers during investigations of two crimes linked to SOF personal service classifieds. In one case, SOF had provided correspondence from its files--along with two affidavits signed by SOF's managing editor--that were used in the 1982 criminal trial of a Houston man who was convicted of soliciting the murder of his wife; during his effort the man had tried to hire a poisons expert by placing a classified ad in the October 1981 issue of SOF. Eimann also presented testimony from a New Jersey detective, who stated that in April 1984, SOF's advertising manager had helped him to identify a man who placed a classified ad in SOF.
 
 
 16
 In addition, Eimann presented expert testimony from Dr. Park Dietz, a forensic psychiatrist who had studied SOF, its ads and readership. Dietz testified that an average SOF subscriber--a male who owns camouflage clothing and more than one gun--would understand some phrases in SOF's classified ads as solicitations for illegal activity given the "context" of those ads.
 
 
 17
 That context included other classified ads in SOF, display ads for semiautomatic rifles and books with titles such as "How to Kill," and SOF articles including "Harassing the Bear, New Afghan Tactics Stall Soviet Victory," "Pipestone Canyon, Summertime in 'Nam and the Dyin' was Easy," and "Night Raiders on Russia's Border." Dietz also described his visit to a SOF convention in summer 1987, where he photographed exhibits of weapons and tactical gear.
 
 
 18
 Based on his studies, Dietz concluded that the Hearn ad "or any other personal service ad in Soldier of Fortune in 1984 foreseeably is related to the commission of domestic crimes." He suggested that classified ads such as Hearn's would not carry such connotations if they appeared in Esquire or Vanity Fair.
 
 
 19
 Dietz conceded, however, that he had abandoned an effort to distinguish lawful SOF classified ads from criminal ones on the basis of specific code words such as "gun for hire," "mechanic" and "hunter" because some ads were too ambiguous to assign an illegal meaning to them with any certainty. He also noted that crimes had been linked to SOF classified ads that "seemed relatively innocuous." For example, one ad tied to a kidnapping and extortion plot read:
 
 
 20
 Recovery and collection. International agents guarantee results on any type of recover[y]. Reply to Delta Enterprises, P.O. Box 5241, Rockford, Illinois 61125.
 
 
 21
 As Dietz stated, "The code system doesn't work."
 
 
 22
 SOF relied primarily on the testimony of its president, Robert K. Brown, who stated he did not know or suspect in 1984 that some of the SOF classified ads had been linked to criminal plots. Other SOF staffers and readers echoed these denials. SOF's advertising manager, Joan Steele, testified that she understood the phrase "high risk assignments" in Hearn's ad to mean "gun for hire," but in the sense of a professional bodyguard or security consultant rather than a contract killer.
 
 
 23
 The district court's first special interrogatory asked the jury whether Hearn's ad "related to" illegal activity. The court's second interrogatory asked, "Did [SOF] ... know or should it have known from the face or the context of the Hearn advertisement that the advertisement could reasonably be interpreted as an offer to engage in illegal activity?"
 
 
 24
 The court's instructions charged SOF with knowledge that Hearn's ad reasonably could be interpreted as such an offer when (1) the relation to illegal activity appears on the ad's face; or (2) "the advertisement, embroidered by its context, would lead a reasonable publisher of ordinary prudence under the same or similar circumstances to conclude that the advertisement could reasonably be interpreted" as an offer to commit crimes. The court went on to define "context" as the magazine's (1) "nature"; (2) other advertisements; (3) articles; (4) readership; and (5) knowledge, if any, that other advertisements in the magazine could reasonably be interpreted as an offer to engage in illegal activity.
 
 
 25
 The jury answered "yes" to the first two interrogatories, and found that SOF's negligence was a proximate cause of Sandra Black's death in response to Interrogatory Three. The court then asked the jury whether SOF's negligence constituted "gross negligence," defined as "conscious indifference." The jury answered "yes" to this interrogatory as well. The jury awarded Eimann $1.9 million in compensatory damages and $7.5 million in punitive damages; the district court entered judgment on the verdict. SOF appeals.
 
 II. ANALYSIS
 A. Overview
 
 26
 Eimann presented this case as a straightforward negligence action revolving around one primary issue: whether SOF knew or should have known from the face or context of Hearn's ad that it represented an offer to perform illegal acts. Based on evidence that SOF knew of links between other classified ads and other criminal plots, she contends that SOF owed a duty to recognize ads such as Hearn's that reasonably might be interpreted as criminal solicitations and refrain from publishing them.
 
 
 27
 SOF argues first that no liability can attach under these facts because the criminal activities of Hearn and Robert Black, rather than Hearn's ad, were the proximate cause of Sandra Black's murder. SOF also argues that imposition of tort liability here contravenes first amendment protection for commercial speech because (1) the judgment below impermissibly imposed a duty on publishers to investigate its advertisers and their ads; and (2) the district court's all-encompassing definition of "context," combined with Dietz's testimony, allowed the jury to penalize SOF for the mercenary and military focus of the magazine's articles and other ads.
 
 
 28
 We need not address SOF's first amendment attacks on the judgment to resolve this appeal.[1] Assuming without deciding that a Texas court would apply general negligence principles to this case, we conclude that no liability can attach under these principles as a matter of law. SOF owed no duty to refrain from publishing a facially innocuous classified advertisement when the ad's context--at most--made its message ambiguous.
 
 
 29
 Under Texas law, negligence liability requires the existence of a duty, breach of that duty, and an injury proximately resulting from that breach. City of Gladewater v. Pike, 727 S.W.2d 514, 517 (Tex.1987). The existence of a duty presents a threshold question of law for the court; the jury determines breach and proximate cause only after the court concludes that a duty exists. See Otis Engineering Corp. v. Clark, 668 S.W.2d 307, 309 (Tex.1983); Abalos v. Oil Dev. Co., 544 S.W.2d 627, 633 (Tex.1976). Our resolution of this case hinges on the initial duty question.
 
 B. Duty
 
 30
 In essence, a duty represents a legally enforceable obligation to conform to a particular standard of conduct. W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Torts Sec. 53 at 356 (5th Ed.1984). Whether the defendant in a negligence action owes a duty involves consideration of two related issues: (1) whether the defendant owes an obligation to this particular plaintiff to act as a reasonable person would in the circumstances; and (2) the standard of conduct required to satisfy that obligation. Id.
 
 
 31
 Texas courts have applied risk-utility balancing tests in resolving both aspects of the duty question. Thus, in deciding whether an actor owes a duty of reasonable care to the public at large, the Supreme Court of Texas has weighed the risk, forseeability and likelihood of injury from certain conduct against the conduct's social utility and the burden of guarding against injury. See Otis Engineering Corp. v. Clark, 668 S.W.2d 307, 309 (Tex.1983) (employer who exercises control over incapacitated employee owes duty of reasonable care to prevent employee from creating unreasonable risk of harm to the public).
 
 
 32
 Similarly, Texas courts have applied risk-utility analysis in determining the second duty issue--whether a defendant who owes an established duty of reasonable care to specified parties must take precautions against particular dangers. See Hendricks v. Todora, 722 S.W.2d 458, 461 (Tex.App.Dallas 1986, writ ref'd n.r.e.) (duty of reasonable care did not require lessee restaurant or its lessor to protect business invitee customers against drunken driver who crashed into restaurant's waiting area). Courts have described this aspect of duty as the defendant's obligation to protect those parties against unreasonable risks. Id.; see Prosser & Keeton, supra, Sec. 31. A risk becomes unreasonable when its magnitude outweighs the social utility of the act or omission that creates it. Hendricks, 722 S.W.2d at 461; Restatement (Second) of Torts Sec. 291 (1965).
 
 
 33
 Our analysis here assumes that SOF owes a duty of reasonable care to the public; we focus on the second prong of the duty issue: whether SOF's decision to print Hearn's ad violated the standard of conduct.
 
 
 34
 In answering this question we look to Judge Learned Hand's concise expression of these balancing principles in United States v. Carroll Towing, 159 F.2d 169, 173 (2d Cir.1947). As he described it in algebraic terms, liability turns on whether the burden of adequate precautions, B, is less than the probability of harm, P, multiplied by the gravity of the resulting injury, L. In other words, an actor falls below the standard of conduct and liability attaches when B is less than PL. Conversely, the actor satisfies the obligation to protect against unreasonable risks when the burden of adequate precautions--examined in light of the challenged action's value--outweighs the probability and gravity of the threatened harm. See Prosser & Keeton, supra Sec. 31 at 173; Restatement (Second) of Torts Sec. 291; Hendricks, 722 S.W.2d at 461.
 
 
 35
 We now turn to these individual factors.
 
 
 36
 1. The Probability and Gravity of the Threatened Harm
 
 
 37
 In assessing the threatened harm we note that "nearly all human acts ... carry some recognizable but remote possibility of harm to another." Prosser Keeton, supra, Sec. 31 at 170. The SOF classified ads presented more than a remote risk. Of the 2,000 or so personal service classified ads that SOF printed between 1975 and 1984, Eimann's evidence established that as many as nine had served as links in criminal plots. Of these nine, the evidence revealed that SOF staffers had participated in at least two police investigations of crimes in which classified ads played a role; other crimes tied to the ads received varying amounts of media coverage.
 
 
 38
 As noted above, the gravity of the threatened harm may require precautions against even unlikely events. Id. For example, the standard of care may require those who own oil storage tanks to take precautions against fires caused by an unpredictable lightning strike. See, e.g., Tex-Jersey Oil Corp. v. Beck, 292 S.W.2d 803, 807-09 (Tex.Civ.App.--Texarkana 1956), aff'd in part and rev'd in part on other grounds, 157 Tex. 541, 305 S.W.2d 162 (Tex.1957), overruled on other grounds in Sanchez v. Schindler, 651 S.W.2d 249, 251 (Tex.1983). The prospect of ad-inspired crime represents a threat of serious harm. Eimann presented evidence that SOF classified ads played a role in other crimes ranging from extortion to jailbreaks. Sandra Black's murder illustrates one aspect of the crime linked to SOF classified advertisements.
 
 2. The Burden of Preventing the Harm
 
 39
 SOF contends that the standard of conduct applied by the district court impermissibly required the magazine to guard against criminal solicitation by investigating its advertisers and their ads. It relies on a series of cases holding that newspaper publishers owe no duty in tort to investigate their advertisers for the accuracy of ads placed for publication. See Pittman v. Dow Jones & Co., 662 F.Supp. 921, 923 (E.D.La.1987).
 
 
 40
 However, in our view the standard of conduct against which the jury measured SOF's actions was more exacting than a duty to investigate; it requires publishers to recognize ads that "reasonably could be interpreted as an offer to engage in illegal activity" based on their words or "context" and refrain from printing them. Based on evidence that SOF knew other ads had been tied to crimes, Eimann's counsel contended at oral argument that SOF should have refrained from publishing Hearn's ad and all other personal service classified ads--suggestive ones and bland ones alike. This represents an especially heavy burden given (1) the ambiguous nature of Hearn's ad; and (2) the pervasiveness of advertising in our society.
 
 
 41
 At most, the evidence reveals that Hearn submitted a facially innocuous ad. Standing alone, the phrase "high risk assignments" plausibly encompassed Hearn's professed goal of recruiting candidates for bodyguard jobs. Hearn performed precisely that function for at least one client who contacted him through the ad.
 
 
 42
 Eimann's effort to portray Hearn's ad as a readily identifiable criminal solicitation falls with Dr. Dietz's repudiation of his effort to identify specific code words signalling criminal intent. At one point in his testimony, Dr. Dietz analyzed a classified ad from the February 1980 issue of SOF. In terms that parallel Hearn's ad, this 1980 ad recruited SOF readers for "exciting high risk undercover stateside work." A court later convicted the individual who submitted it of mailing a threatening communication after he sent a letter instructing someone who had responded to the ad to "terminate" a person in Oklahoma City. Dr. Dietz stated:
 
 
 43
 In 1984, in my opinion, someone familiar with the classified ads that have been run for years in Soldier of Fortune would be able to recognize from that ad that this is possibly someone who would be willing to be involved in criminal activity; but they might be wrong when they thought that. We knew that sometimes there were honest advertisers, and we know that some of the readers who responded to ads were honest too.
 
 
 44
 (emphasis added).
 
 
 45
 Dr. Dietz's description applies with equal force to Hearn's ad. Its bare terms reveal no identifiable offer to commit crimes, just as a locksmith's ad in the telephone directory reveals nothing about that particular advertiser's willingness to commit burglaries or steal cars.
 
 
 46
 This ambiguity persists even if we assume that SOF knew other ads had been tied to criminal plots. No evidence linked the other ads and crimes to Hearn. And as Eimann conceded, even if SOF had investigated Hearn and his partner in 1984, it would have discovered no criminal records and no false information that might have aroused suspicion.
 
 
 47
 Further, Eimann's heavy reliance on "context" cannot compensate for the fundamental ambiguity of Hearn's ad even if we assume that the district court properly defined that context. The presence in SOF of other ads and articles with violent themes provides no realistic method for gauging the likelihood that a particular ad will foster illegal activity. Do ads touting high-performance cars become solicitations for illegal activity when buyers drive them beyond the speed limit? Only when the ads run in Car and Driver magazine? Or, only when the ads run in magazines that also contain ads for radar detectors?
 
 
 48
 While we do not reach SOF's first amendment arguments, the Supreme Court's recognition of limited first amendment protection for commercial speech nonetheless highlights the important role of such communication for purposes of risk-benefit analysis. As the Court has noted, "[T]he particular consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate...." Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 763, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976). The Supreme Court's subsequent emphasis on the states' interest in regulating commercial speech neither erases this first amendment protection nor alters the fact that advertising is a part of daily life. See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); Posadas de Puerto Rico Associates v. Tourism Co., 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).
 
 
 49
 Eimann seeks to discount the importance of SOF's classified ads by stressing that (1) SOF's publisher promoted the ads because they added to the "flavor and mystique" of the magazine; and (2) the jury found that Hearn's ad "relate[d] to" illegal activity. She notes that the Supreme Court has excluded advertising of illegal activity from the scope of first amendment protection. See Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 388-89, 93 S.Ct. 2553, 2560-61, 37 L.Ed.2d 669 (1973) (newspaper's placement of help-wanted ads in sex-segregated columns violated anti-discrimination ordinance; "Any First Amendment interest which might have been served by advertising an ordinary commercial product ... is altogether absent when the commercial activity itself is illegal....") However, in the constitutional arena we have noted that the possibility of illegal results does not necessarily strip an ad of its commercial speech protection.
 
 
 50
 In Dunagin v. City of Oxford, 718 F.2d 738 (5th Cir.1983) (en banc), this court upheld the constitutionality of a Mississippi law that banned liquor advertising by local, in-state media on grounds that the ban was no broader than necessary to advance the goal of promoting prohibition in the state's dry counties. See Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351. But in doing so the court rejected arguments that liquor advertising necessarily related to unlawful activity in Mississippi--even though nearly half of Mississippi's counties are dry, and even though wet counties prohibit alcohol consumption in places such as public schools and colleges. The court stated,
 
 
 51
 The commercial speech doctrine would disappear if its protection ceased whenever the advertised produce might be used illegally. Peanut butter advertising cannot be banned just because someone might someday throw a jar at the presidential motorcade.
 
 
 52
 Dunagin, 718 F.2d at 743.
 
 
 53
 Similarly, a standard of conduct that imposes tort liability whenever the advertised product "could reasonably be interpreted as an offer to engage in illegal activity"--or might "relate to" criminal conduct--imposes an especially heavy burden. The comments of a court faced with a duty-to-investigate claim apply here:
 
 
 54
 For the law to permit such exposure to those in the publishing business who in good faith accept paid advertisements for a myriad of products would open the doors "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class."
 
 
 55
 Yuhas v. Mudge, 129 N.J.Super. 207, 322 A.2d 824 (App.Div.1974) (citation omitted) (publisher owes no duty to investigate safety of "inherently dangerous" products advertised in its publication). Relatedly, the publication's editorial content would surely feel the economic crunch from loss of revenue that would result if publishers were required to reject all ambiguous advertisements. See Walters v. Seventeen Magazine, 195 Cal.App.3d 1119, 241 Cal.Rptr. 101, 103 (1987).
 
 3. Balancing the Burdens and Risks
 
 56
 We conclude that the standard of conduct imposed by the district court does not strike the proper balance between the risks of harm from ambiguous advertisement and the burden of preventing harm from this source under these facts. The appreciable risk that ads such as Hearn's will cause harm, combined with the gravity of that harm, does not outweigh the onerous burden Eimann asks us to endorse.
 
 
 57
 Hearn's ad presents a risk of serious harm. But everyday activities, such as driving on high-speed, closed access roadways, also carry definite risks that we as a society choose to accept in return for the activity's usefulness and convenience. See Restatement (Second) of Torts Sec. 291 comment e at 56 (1965). To take a more extreme example, courts have almost uniformly rejected efforts to hold handgun manufacturers liable under negligence or strict liability theories to gunshot victims injured during crimes, despite the real possibility that such products can be used for criminal purposes. See Perkins v. F.I.E. Corp., 762 F.2d 1250, 1275 (5th Cir.1985) (applying Louisiana law); Armijo v. Ex Cam, Inc., 656 F.Supp. 771, 775 (D.N.M.1987) (applying New Mexico law); Caveny v. Raven Arms Co., 665 F.Supp. 530, 536 (S.D.Ohio 1987) (applying Ohio law); Patterson v. Gesellschaft, 608 F.Supp. 1206 (N.D.Tex.1985) (applying Texas law). Given the pervasiveness of advertising in our society and the important role it plays, we decline to impose on publishers the obligation to reject all ambiguous advertisements for products or services that might pose a threat of harm.
 
 III. CONCLUSION
 
 58
 The standard of conduct imposed by the district court against SOF is too high; it allows a jury to visit liability on a publisher for untoward consequences that flow from his decision to publish any suspicious, ambiguous ad that might cause serious harm. The burden on a publisher to avoid liability from suits of this type is too great: he must reject all such advertisements.
 
 
 59
 The range of foreseeable misuses of advertised products and services is as limitless as the forms and functions of the products themselves. Without a more specific indication of illegal intent than Hearn's ad or its context provided, we conclude that SOF did not violate the required standard of conduct by publishing an ad that later played a role in criminal activity.
 
 
 60
 The judgment of the district court is REVERSED and RENDERED.
 
 
 
 [1]
 SOF asserts primarily that this case involves protected commercial speech; it argues further that the district court's broad definition of "context" and Eimann's emphasis on the mercenary focus of SOF's ads and articles amounted to impermissible content distinctions in violation of first amendment principles. See, e.g., Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332-33, 65 L.Ed.2d 319 (1980). For their part, the Amici Curiae arguing on SOF's behalf contend that the district court erred in applying a negligence standard to a case that arguably involves commercial speech. See Goldstein v. Garlick, 65 Misc.2d 538, 318 N.Y.S.2d 370, 374 (Sup.Ct.1971) (publication of false ad actionable only if published maliciously, with intent to harm, or in reckless disregard of the ad's consequences); but see South Carolina State Ports Authority v. Booz-Allen & Hamilton, Inc., 676 F.Supp. 346 (D.D.C.1987); Norwood v. Soldier of Fortune Magazine, Inc., 651 F.Supp. 1397, 1398-1402 (W.D.Ark.1987). We need not confront these issues given our conclusion that no liability attaches here even if the court below properly applied negligence law to a commercial speech case and properly defined the "context" used to evaluate SOF's actions