[No. G004430. Fourth Dist., Div. Three. Sept. 30, 1987.]

LISA MARIE WALTERS, a Minor, etc., et. al., Plaintiffs and Appellants, v.
SEVENTEEN MAGAZINE et al., Defendants and Respondents.

**COUNSEL**

Yacobozzi & Sterling and Leland D. Sterling for Plaintiffs and Appellants.

Highman, Dillard & Fuller and Bernadette Van Hook for Defendants and Respondents.

**OPINION**

**WALLIN, J.**—Lisa Walters sued Seventeen Magazine, Inc. (Seventeen) and its parent company Triangle Communications, Inc., (Triangle) among others, for damages resulting from her use of Playtex tampons. ▉ Walters had a subscription to Seventeen in November 1984, and read its advertisements for Playtex tampons. After using one she became violently ill and was hospitalized for toxic shock. Walters alleges the advertisements were placed in the magazine amidst feature articles on puberty, gynecology and menstruation, thereby misleading young readers to believe Seventeen endorsed the tampons. Her complaint alleged negligence, product liability, breach of warranty, conspiracy, fraudulent advertising and associated theories.

Walters further claims that when Seventeen ran the ads it had already been alerted to the dangers of the illness by the removal from commerce of Rely tampons, which contained the same toxic shock-causing ingredient used in the Playtex tampons.

Triangle and Seventeen successfully demurred to Walters's second amended complaint. The companies argued a publisher does not warrant

products it advertises, has no duty to investigate them, and cannot be held liable for defective products unless it endorses a product for economic gain and for the purpose of inducing the public to buy it. Seventeen also claims the First Amendment protects commercial speech of the type found here.

Walters appeals from the judgment of dismissal. We find the trial court properly sustained the demurrer, and affirm.

Only one reported California decision has ever held a publisher liable for a product advertised in its magazine, and that case is easily distinguishable. In *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680 [81 Cal.Rptr. 519, 39 A.L.R.3d 173] the plaintiff bought a pair of shoes advertised in Good Housekeeping Magazine as bearing " 'Good Housekeeping's Consumer Guaranty Seal.' " The seal stated: " 'We satisfy ourselves that products advertised in Good Housekeeping are good ones and that the advertising claims made for them in our magazine are truthful.' " (*Id.,* at p. 682.) The seal also promised Good Housekeeping would guarantee the consumer replacement or refund of any defective product. (*Ibid.*) The Hearst Corporation published Good Housekeeping Magazine.

Hanberry sued Hearst, among others, alleging the soles of the shoes were defectively manufactured, causing her to slip, fall, and sustain serious injuries. (*Ibid.*) She also alleged she believed products bearing the seal had been tested by Good Housekeeping and found to be safe; that the seal was affixed to the box of shoes she purchased; that she relied on the endorsement in buying the shoes; and that the manufacturer paid the publisher to use the seal. (*Id.,* at p. 683.)

The Court of Appeal analyzed Hanberry's claim in this fashion: "The basic question presented on this appeal is whether one who endorses a product for his own economic gain, and for the purpose of encouraging and inducing the public to buy it, may be liable to a purchaser who, relying on the endorsement, buys the product and is injured because it is defective and not as represented in the endorsement. We conclude such liability may exist and a cause of action has been pleaded in the instant case." (*Ibid.*) The court noted that, in using its seal to sell products, Hearst "in effect loaned its reputation to promote and induce the sale of a given product . . . ." (*Id.,* at p. 684.) In doing so Hearst "placed itself in the position where public policy imposes on it the duty to use ordinary care in the issuance of its seal and certification of quality so that members of the consuming public who rely on its endorsement are not unreasonably exposed to the risk of harm. [Citation.]" (*Ibid.*)

The court limited Hanberry's cause of action to one for negligent misrepresentation, however, and rejected alternate theories of warranty and product liability. It reasoned: "[Hanberry] has cited no authority, and we have found none, which has extended either theory of recovery to one not directly involved in manufacturing products for, or supplying products to, the consuming public." (*Id.,* at p. 687.)

*Hanberry* is clearly inapposite. Seventeen did not in any way sponsor or endorse products advertised in its pages. There was no representation of quality, no promotional effort, and no attempt to induce the public to buy Playtex tampons beyond merely printing the advertisement. Walters tries to avoid this shortcoming by arguing Seventeen ran ads indistinguishable from feature articles, and placed them in the magazine amid stories on menstruation, sex, and the female body. To the immature reader unable to distinguish between advertising and regular copy, she says, this implies an endorsement.

Walters's first claim, regarding ad placement, is utterly devoid of support in the record, and in any event is meaningless by itself. As to the ads' supposed likeness to feature stories, we have reviewed the advertisements appended to the complaint as exhibits. Even a small child could easily distinguish them from regular copy. They bear absolutely *no* resemblance to feature articles.

In the absence of any cause of action supported by traditional theories, we are loathe to create a new tort of negligently failing to investigate the safety of an advertised product. Such a tort would require publications to maintain huge staffs scrutinizing and testing each product offered. The enormous cost of such groups, along with skyrocketing insurance rates, would deter many magazines from accepting advertising, hastening their demise from lack of revenue. Others would comply, but raise their prices beyond the reach of the average reader. Still others would be wiped out by tort judgments, never to revive. Soon the total number of publications in circulation would drop dramatically.

Perhaps this dire possibility is one reason the United States Supreme Court has been so vigilant about linking commercial speech to the First Amendment. (See *Posadas de Puerto Rico Associates* v. *Tourism Co.* (1986) 478 U.S. 328 [92 L.Ed.2d 266, 106 S.Ct. 2968]; *Zauderer* v. *Office of Disciplinary Counsel* (1985) 471 U.S. 626 [85 L.Ed.2d 652, 105 S.Ct. 2265]. See also *Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033 [232 Cal.Rptr.

542, 728 P.2d 1177].) For this reason as well, we sustain the trial court's ruling.

The judgment is affirmed. Respondents shall have their costs.

Sonenshine, J., and Crosby, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 16, 1987.