**Jan WAY, Individually and on behalf of the Estate of Rocky William Miller, Deceased, Appellant,**

v.

**BOY SCOUTS OF AMERICA, National Shooting Sports Foundation, Inc., and Remington Arms Company, Inc., Appellees.**

No. 05–92–01005–CV.

Court of Appeals of Texas, Dallas.

May 13, 1993.

Rehearing Denied June 18, 1993.

---

[black redaction blocks]

David R. Weiner, R. Windle Tuuley, Robert L. Greening, Dallas, for appellant.

Thomas S. Leatherbury, Dallas, for Boy Scouts of America.

Randal Mathis, Dallas, for Remington Arms Co.

Sandra K. Houston, James W. Watson, Fort Worth, for Nat. Shooting Sports Foundation.

Before CHAPMAN, BARBER and WHITTINGTON, JJ.

## OPINION

WHITTINGTON, Justice.

Jan Way, individually and on behalf of the estate of Rocky William Miller, deceased, sued the Boy Scouts of America, National Shooting Sports Foundation, Inc., and Remington Arms Company, Inc. claiming that a supplement on shooting sports published in *Boys' Life* magazine caused the death of her son. Way's twelve-year-old son, Rocky, read the supplement on shooting sports and was later killed when the rifle he and several friends were playing with accidentally discharged. We must decide whether Texas law, under these circumstances, recognizes a cause of action for publication of an article or advertisement that causes harm to a reader. In the trial court, appellees separately moved for summary judgment. The trial court granted appellees' motions for summary judgment. Appellant contends the trial court erred in granting summary judgment. Because we conclude that Texas law does not recognize a cause of action for publication of an article or advertisement that causes harm under these circumstances, we affirm the trial court's judgment.

## BACKGROUND

Included in the September 1988 edition of *Boys' Life* magazine was an advertising supplement on shooting sports, sponsored by National Shooting Sports Foundation Inc., in which Remington Arms Company, Inc., placed an advertisement. Included in the sixteen-page supplement were advertisements for firearms and ammunition manufacturers. With the various manufacturer advertisements, the supplement contained the following articles: *How it Feels to Carry Our Flag at the Olympics, Experience Biathlon, Qualify for a Presidential Sports Award, Earn Your Straight Shooter Award,* and *Getting Started in the Shooting Sports.* These articles supplied information about earning merit badges for shooting; the biathlon, an Olympic shooting sport; the Presidential Sports Award, which can be earned for accomplishments in the shooting sports; and getting started in the shooting sports. The supplement also included a checklist on firearm safety.

After reading the September supplement and obtaining information on shooting sports, Rocky and several of his friends located an old rifle and a .22–caliber cartridge. On November 19, 1988, Rocky was killed when the rifle accidentally discharged.

Jan Way sued the Boy Scouts of America, National Shooting Sports Foundation, Inc., and Remington Arms Company, Inc., for the death of her son. Way based her action on theories of negligence and strict products liability, claiming negligent publication of supplemental material in *Boys' Life* magazine and that the information contained in the supplement made the magazine a defective product. She alleged her son was motivated to experiment with the rifle and cartridge as a direct result of the supplemental edition to the September 1988 edition of *Boys' Life* magazine published by the Boy Scouts of America.

The Boy Scouts of America and the National Shooting Sports Foundation filed motions for summary judgment alleging: (1) Texas law does not recognize a cause of action for negligent publication, and no duty was owed to plaintiff; (2) there was no duty to warn of the allegedly dangerous nature of the supplement; (3) no special

duty was owed to plaintiff, a minor; (4) no statute was violated; (5) *Boys' Life* magazine and the supplement are not "products" within the meaning of sections 402A and 402B of the Restatement (Second) of Torts; and (6) the claims are barred by the First Amendment of the United States Constitution and article I, section eight of the Texas Constitution.[1] Remington Arms' motion for summary judgment asserted: (1) no duty; (2) the First Amendment of the United States Constitution; and (3) article I, section eight of the Texas Constitution.

◼ The trial court granted the motions of all three appellees. Because the trial court's order does not state the grounds on which the court sustained appellees' motions, the summary judgments will be affirmed if any of the theories advanced are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989). In nine points of error, Way contends that the trial court erred in granting summary judgment on each and every ground raised by appellees in their motions.

## STANDARD OF REVIEW

In reviewing a summary judgment record, we apply the following standards:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.
2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.
3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

◼ For a defendant, as movant, to prevail on a summary judgment, it must either disprove at least one element of the plaintiff's theory of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *International Union UAW Local 119 v. Johnson Controls, Inc.*, 813 S.W.2d 558, 563 (Tex.App.–Dallas 1991, writ denied). A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex.1982). A summary judgment for the defendant disposing of the entire case is proper only if, as a matter of law, the plaintiff could not succeed upon any theories pleaded. *See Delgado v. Burns*, 656 S.W.2d 428, 429 (Tex.1983).

## NEGLIGENCE

Way contends appellees breached both common law and statutory duties owed to Rocky Miller. Way asserts negligence claims against appellees on the basis of negligent publication, negligence per se, and the attractive nuisance doctrine. Because of the similarity of issues and allegations directed towards appellees, we will address the negligence claims against the three appellees together.

### A. Negligent Publication

◼ The common law doctrine of negligence consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). Before there can be a cause of action for negligence, the court must determine that the defendant had a recognized legal duty or obligation to the plaintiff. *See El Chico*, 732 S.W.2d at 311; *see also Greater Houston Transp. Co.*, 801 S.W.2d at 525.

◼ A duty represents a legally enforceable obligation to conform to a particular standard of conduct. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53, at 356 (5th ed. 1984). The existence of duty is a question of law for

---

1. The Boy Scouts of America did not claim the Texas Constitution as a defense to Way's claims.

the court to decide from the facts surrounding the occurrence in question. *Greater Houston Transp. Co.*, 801 S.W.2d at 525; *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983).

█ To determine whether a duty exists, we apply a risk-utility balancing test. We consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendants. *See Greater Houston Transp. Co.*, 801 S.W.2d at 525; *accord Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830, 834 (5th Cir. 1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). Of these factors, foreseeability is the foremost and dominant consideration. *Greater Houston Transp. Co.*, 801 S.W.2d at 525. The test for foreseeability is "what one should under the circumstances reasonably anticipate as consequences of his conduct." *McCullough v. Amstar Corp.*, 833 S.W.2d 312, 315 (Tex.App.–Amarillo 1992, no writ) (quoting *City of Dallas v. Maxwell*, 248 S.W. 667, 670 (Tex.Comm'n App.1923, holding approved)).

█ Way argues that the shooting supplement presented a foreseeable and unreasonable risk of harm to its youthful readers. The supplement presented information about the power, speed, sounds, and accuracy of firearms and ammunition, with images promoting and conveying the fun and excitement of shooting to boys the age of Rocky Miller and his friends. Way asserts the limited references to shooting safety were lost in the effort to peddle guns and ammunition to children and concludes that it is clear from the evidence that the firearms supplement presented an unreasonable risk of harm to young readers such as Rocky Miller.

Way argues appellees had a duty to exercise reasonable care either not to create this risk of harm or to take steps to mitigate the risk by giving clear, explicit, prominent warnings to children about the dangers inherent in the use of firearms and ammunition. Way asserts that appellees' reliance on decisions from other jurisdictions supporting their claim that a publisher may not be held liable for negligence in publishing an article or advertisement is misplaced.

Appellees rely on the Fifth Circuit's decision in *Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830 (5th Cir.1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). In *Eimann*, the plaintiff brought a negligence action against a magazine that published a classified advertisement for an ex-Marine willing to take "high risk assignments." A man read the advertisement and hired the advertiser to murder his wife.

The Fifth Circuit, applying Texas law, held that the publisher had not violated a legal duty by publishing an advertisement that was facially innocuous. While acknowledging that the "prospect of ad-inspired crime represents a threat of serious harm," the court weighed that threat against the burden on a publisher to recognize and refrain from printing an advertisement that could reasonably be interpreted as an offer to engage in illegal activity. *Eimann*, 880 F.2d at 835. The burden of preventing harm would have required the magazine to refrain from printing any personal service classified advertisements, whether suggestive of offers to engage in illegal activity or wholly innocent.

After balancing the threat of harm against the potential burden on protected speech, the court stated: "The range of foreseeable misuses of advertised products and services is as limitless as the forms and functions of the products themselves." *Eimann*, 880 F.2d at 838. The court concluded that the magazine did not violate the required standard of conduct by publishing the advertisement.

Way argues that the *Eimann* court focused on the ambiguous nature of the advertisement and refused to place the onerous burden on the magazine to refrain from the publication of any personal service classified advertisements for fear one may be an offer to engage in illegal activity. Way contends that the shooting sup-

plement motivated, promoted, and advertised the use of firearms and ammunition by minors. Way argues that under these circumstances the foreseeability of the particular risk of harm to minors created by these advertisements is clear-cut. She cites to a series of *Soldier of Fortune* cases to support her contentions.

In *Norwood v. Soldier of Fortune Magazine, Inc.*, 651 F.Supp. 1397 (W.D.Ark. 1987), the court dealt with a "gun for hire" advertisement and the resulting illegal activity. Applying Arkansas law, the reviewing court reversed the trial court's granting of a publisher's motion for summary judgment and held that the risk was foreseeable. But in holding that the risk of injury was foreseeable, the court did not use a risk-utility analysis and balance the risk of harm against the utility of the defendant's conduct. Thus, *Norwood* is inapplicable.

We also find the Eleventh Circuit's opinion in *Braun v. Soldier of Fortune* to be distinguishable. *See Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110 (11th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993). In *Braun*, the Eleventh Circuit, applying Georgia law, upheld a finding of publisher liability in a similar "gun for hire" advertisement. The court distinguished *Eimann* by agreeing that the advertisement at issue in *Eimann* was "facially innocuous" and "ambiguous in its message" while the advertisement in question clearly conveyed the advertiser to be "ready, willing and able" to use his gun to commit crimes. *Braun*, 968 F.2d at 1116 n. 3.

Appellees also rely on *Walters v. Seventeen Magazine*, 195 Cal.App.3d 1119, 241 Cal.Rptr. 101 (1987) in which the plaintiff, a minor, suffered toxic shock syndrome from using Playtex Tampons. She alleged that she purchased the tampons in reliance on an advertisement contained in *Seventeen Magazine*, a publication directed at minors. She further alleged that the magazine already had been alerted to the dangers of toxic shock syndrome after the removal from commerce of Rely Tampons.

The court rejected the plaintiff's claim, holding that the publisher was not responsible for the injuries sustained by the plaintiff. In reaching this decision, the court held it would not "create a new tort of negligently failing to investigate the safety of an advertised product." *Walters*, 241 Cal.Rptr. at 103.

Way argues the present case is different. In contrast to *Walters*, Way argues that she does not seek to hold appellees liable for failing to investigate the safety of an advertised product; rather, she argues appellees' liability depends on the negligent publication and promotion of firearms and ammunition. Additionally, she asserts that *Walters* is distinguishable because it involved the advertisement of a product that, unlike firearms and ammunition, clearly is legal for all minors to purchase.

In *Walters*, the duty raised was a duty to investigate the safety of a product. Way contends the duty in this case was not a duty to investigate but a duty not to publish with respect to a dangerous product, or, if the decision to publish was made, to warn. But, according to Walter's allegations, the publisher knew that the product was dangerous before publication because of information available on toxic shock syndrome and the recall of Rely Tampons. *Walters*, 241 Cal.Rptr. at 101. Both *Walters* and this case involve liability for publication of advertisements for dangerous products that allegedly harmed readers, in magazines aimed toward minors.

In *Yuhas v. Mudge*, 129 N.J.Super. 207, 322 A.2d 824 (Ct.App.Div.1974), plaintiffs suffered injuries from exploding fireworks advertised in *Popular Mechanics Magazine*. Plaintiffs sued, alleging the publisher of the magazine owed a duty to investigate and test inherently dangerous products advertised in its publication. The reviewing court refused to impose such a broad legal duty upon publishers that neither guarantee, warrant, nor endorse products in the paid advertisements. *Yuhas*, 322 A.2d at 825.

Way argues that the magazine supplement created a foreseeable risk of harm that a child in Rocky's circumstances would

experiment with firearms. Although experimentation with firearms obviously poses serious risks to children, to merely focus on that risk would be to ignore the context in which the supplement presented the use of firearms.

Of greatest significance, the record does not support a conclusion that Rocky's experimentation with the rifle and cartridge was a reasonably foreseeable consequence of the publication. It is foreseeability that provides the touchstone in determining whether circumstances give rise to a duty. *See Greater Houston Transp. Co.*, 801 S.W.2d at 525; *El Chico Corp.*, 732 S.W.2d at 311. Way characterizes Rocky's conduct with the rifle and cartridge as an "experiment." Additionally, Way states that Rocky was with several young boys at the time of the accident. The record also reveals that the boys were not supervised by an adult when the firearm discharged.

These circumstances of Rocky's death, however, are at odds with the risks foreseeably created by the message conveyed by the supplement. Photographs on the cover of the supplement emphasize supervision and use of firearms in a structured environment. Similarly, features present the use of firearms not as an experiment, but as a supervised and safety-conscious activity. A number of manufacturer advertisements in the supplement also depict a child's use of firearms as a supervised activity.

Way argues that the foreseeable risk created by the publication of the supplement was that Rocky would be induced to experiment as he did with the rifle and cartridge. We disagree and conclude that if publication of the supplement created foreseeable risks, Rocky's experiment and any harm resulting from his experiment were not among them.

On the other side of the risk-utility equation, risks associated with unsupervised and unsafe use of firearms by children is a factor that increases the social utility of the supplement. Indeed, Way notes that tragedies that occur when firearms have "fallen into the hands" of children are far too common. As we have already noted,

the information contained in the supplement promoted safe and responsible use of firearms, and was reasonably calculated to lessen the possibility of accidental death caused by a child's use of firearms.

Given the pervasiveness of firearms in society, we conclude that encouragement of safe and responsible use of firearms by minors in conjunction with Boy Scout and other supervised activities is of significant social utility. Also included in our consideration of the social utility of publishing the supplement is our recognition of the pervasiveness of advertising in society and the important role it plays. *See Eimann*, 880 F.2d at 838 (recognizing pervasiveness and importance of advertising in applying Texas risk-utility analysis). The weight we attach to the social utility of advertising in this case is further strengthened by the fact that the supplement provided useful information about lawful products.

As to Way's argument about not creating the risk, Way apparently argues that appellees should not publish, sponsor, or advertise such supplements. Like the *Eimann* court, we do not reach First Amendment freedom of speech arguments. *See Eimann*, 880 F.2d at 836. We conclude, however, that the *Eimann* court was correct in reasoning that the Supreme Court's recognition of limited First Amendment protection for commercial speech highlights the important role of such communication for purposes of risk-utility analysis. *See Eimann*, 880 F.2d at 836. As the Supreme Court has recognized: "As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763, 96 S.Ct. 1817, 1826, 48 L.Ed.2d 346 (1976) (quoted in *Eimann*, 880 F.2d at 836). In light of the recognized pervasive and important role of advertising in society, *see Eimann*, 880 F.2d at 838, we conclude that the burdens and consequences of not publishing such a supplement weighs in favor of appellees.

Under the facts of this case, a risk-utility analysis leads us to conclude that the firearms supplement did not create a duty on the part of appellees to either refrain from publishing the supplement or add warnings about the danger of firearms and ammunition. *See Greater Houston Transp. Co.,* 801 S.W.2d at 525 (stating elements of risk-utility balancing test). We find the balance of guarding against the risk of harm, the actual risk of harm presented, and the burden of preventing harm weighs in favor of appellees.

Accordingly, under the facts of this case, we find appellees owed no duty to Rocky.

### B. Violation of Statutory Duty

 Way attacks the summary judgment on the basis that appellees breached a duty arising from statutory law. Way contends that by publishing the supplement, the appellees violated Texas Penal Code section 46.07(a)(2) because the advertisements, on their face, were offers to sell firearms to minors.

Texas Penal Code sections 46.07(a)(2) and 46.07(c) provide:

(a) A person commits an offense if he:

\* \* \* \* \* \*

(2) intentionally or knowingly sells, rents, leases, or gives or *offers to sell,* rent, lease, or give to any child younger than 18 years any firearm, club, or illegal knife or martial arts throwing stars.

\* \* \* \* \* \*

(c) It is an affirmative defense to prosecution under subsection (a)(2) of this section that the transfer was to a minor whose parent or the person having legal custody of the minor had given written permission for the sale or, if the transfer was other than a sale, the parent or person having legal custody had given effective consent.

TEX. PENAL CODE ANN. § 46.07(a)(2), (c) (Vernon 1989) (emphasis added).

Appellees argue that the language of the statute contemplates specific, individual transactions between private parties and in no way addresses general-purpose advertising or placing advertisements to the public at large. Appellees further argue that the statute itself does not forbid the sale of firearms to minors as long as they obtain parental permission. Appellees also argue that advertisements are not *offers to sell* firearms to minors.

The key issue is whether the advertisements in the supplement are *offers to sell* firearms to minors. The statute is a prohibition of the actual transfer of firearms to minors and parental permission is an affirmative defense. TEX. PENAL CODE ANN. § 46.07(c). Appellees cite *Corbin on Contracts,* which states "[s]uch advertisements are understood to be mere requests to consider and examine and negotiate; and no one can reasonably regard them otherwise unless the circumstances are exceptional and the words used are very plain and clear." 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 25 (1963).

Way cites no cases supporting her proposition that the statute applies to advertisements, and we conclude that it does not. Such a sweeping interpretation as Way's would make virtually any firearm advertisement in Texas illegal. We conclude that the advertisements are not *offers to sell* firearms to minors as contemplated by the statute. We hold that appellees have sustained their summary judgment burden as to the negligence per se cause of action.

### C. Attractive Nuisance

Way also urges this Court to allow her negligence cause of action on the basis of the attractive nuisance doctrine. Way concedes that no Texas cases support this contention. Way submits that the doctrine should be extended to apply to all cases in which the condition of property or product, be it real or personal, creates a foreseeable risk of harm to children. In essence, Way is urging this Court to extend a doctrine concerning landowner liability for trespassing children to the shooting sports supplement in *Boys' Life. See* RESTATEMENT (SECOND) OF TORTS § 339 (1965).

In Texas, the attractive nuisance doctrine is applied in premises-liability cases. *E.g., Banker v. McLaughlin,* 146 Tex. 434, 443, 208 S.W.2d 843, 848 (1948). We note that the court in that case urged caution in applying the doctrine. *Banker,* 208 S.W.2d at 850. A federal court applying Texas law has refused to extend the doctrine to written publications and stated: "No court has held that the written word is either an attractive nuisance that would impose a special duty on defendant magazine, or a dangerous instrumentality for which defendant would be strictly liable." *Herceg v. Hustler Magazine, Inc.,* 565 F.Supp. 802, 803 (S.D.Tex.1983).

Way provides no authority to support her invitation to extend the doctrine of attractive nuisance beyond its well-defined limits to cases such as this. Way merely asserts that the publication was dangerous and was an attraction to the children. In light of Way's bare assertion and the record now before us, we decline to extend the doctrine of attractive nuisance to the advertising supplement and overrule Way's points of error two, five, and eight.

## STRICT LIABILITY

In points of error three, six, and nine, Way attacks appellees' summary judgment on the grounds of strict liability. Way alleges that Boy Scouts published, National Shooting Sports Foundation sponsored and endorsed, and Remington Arms advertised in a product that encouraged and motivated minors to engage in the shooting of firearms. Way argues that under sections 402A and 402B of the Restatement (Second) of Torts, appellees are strictly liable for her son's death.

The Texas Supreme Court has adopted the theory of strict tort liability in section 402A [2] as the rule applicable to defective products that cause physical harm to persons. *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 789 (Tex.1967). Section 402B of the Restatement (Second) of Torts provides for a form of strict liability distinct from liability under section 402A. Section 402B imposes strict liability for physical harm to the consumer resulting from a misrepresentation of material fact concerning the character or quality of the *product* sold and upon which the consumer justifiably relied, even though the misrepresentation is an innocent one that is not made fraudulently or negligently. *Nugent v. Utica Cutlery Co.,* 636 S.W.2d 805, 808 (Tex.App.—San Antonio 1982, writ dism'd). But, the very essence of a products liability cause of action under 402A or 402B is the existence of a *product* within the meaning of the Restatement (Second) of Torts.

Way relies on *Brocklesby v. United States,* 767 F.2d 1288 (9th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 918 (1986); *Saloomey v. Jeppesen & Co.,* 707 F.2d 671 (2d Cir.1983); and *Fluor Corp. v. Jeppesen & Co.,* 170 Cal. App.3d 468, 216 Cal.Rptr. 68 (1985), to support her contention that the advertising supplement was a product. These three cases are factually distinguishable from the present case.

All three cases involved aircraft charts and flight maps that erroneously depicted data necessary for the navigation and operation of an airplane. In those cases, the charts were physically used in the operation of the aircraft at the time of the accident. The inaccurate data directly caused or was alleged to have caused the accidents

**2.** Section 402A provides:
 (1) One who sells any *product* in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 RESTATEMENT (SECOND) OF TORTS § 402A (1965) (emphasis added).

in question in the same manner in which a broken compass or an inaccurate altimeter would have caused a plane to crash.

Here, Way is not complaining about the physical properties of the supplement. She alleges the ideas and information contained in the magazine encouraged children to engage in activities that were dangerous. These are intangible characteristics, not tangible properties. The Ninth Circuit explained the distinction between tangible and intangible aspects of a publication as follows:

> A book containing Shakespeare's sonnets consists of two parts, the material and the print therein, and the ideas and expression thereof. The first may be a product, but the second is not. The latter, were Shakespeare alive, would be governed by copyright laws; the laws of libel, to the extent consistent with the First Amendment; and the laws of misrepresentation, negligent misrepresentation, negligence, and mistake. These doctrines applicable to the second part are aimed at the delicate issues that arise with respect to intangibles such as ideas and expression. Products liability law is geared to the tangible world.

*Winter v. G.P. Putnam's Sons,* 938 F.2d 1033, 1034 (9th Cir.1991). In *Winter,* the plaintiffs consulted *The Encyclopedia of Mushrooms* in gathering and cooking mushrooms. After eating the mushrooms, they became sick. The plaintiffs analogized their case to the ones involving defective aeronautical charts to support their cause of action for products liability. The *Winter* court rejected this argument. The court found the aeronautical charts to be highly technical tools similar to a compass. In contrast, the court found the *Encyclopedia of Mushrooms* to be like a book on how to use a compass or aeronautical chart. The court further found that although the chart itself is like a physical product, the how-to-use book is pure thought and expression. The court concluded there was no basis for a products liability action.

Additionally, in *Herceg v. Hustler Magazine,* a diversity case applying Texas law, the court summarized the law in this area as follows:

> Plaintiffs' claims under strict liability are without support in existing case law. The Court is aware of no court which has held that the content of a magazine or other publication is a product within the meaning of § 402A of the Second Restatement of Torts. Rather, they have held to the contrary.

*Herceg,* 565 F.Supp. at 803.

We conclude that the ideas, thoughts, words, and information conveyed by the magazine and the shooting sports supplement are not *products* within the meaning of the Restatement (Second) of Torts.

Way additionally contends: (1) the magazine was dangerous in the design of its content because the inclusion of the commercial shooting supplement rendered the product unreasonably dangerous; and (2) appellees had a duty to furnish adequate warnings and instructions for the safe use of the product. Because we find the content of the magazine and supplement are not products within the meaning of the Restatement (Second) of Torts, these contentions are also without merit. We overrule Way's points of error three, six, and nine.

We conclude the trial court did not err in granting appellees' motions for summary judgment. We overrule Way's points of error one, four, and seven. We have determined that Way cannot prevail on any of her pleaded theories. Therefore, we need not discuss appellees' affirmative defenses. We affirm the trial court's judgment.