**Affirm and Opinion Filed April 29, 2020**



**In The**

**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-18-00592-CV**

**ARKING JONES, Appellant**
**V.**
**KIRKSTALL ROAD ENTERPRISES, INC., Appellee**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-01794**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Reichek, and Carlyle
Opinion by Justice Pedersen, III

Appellant Arking Jones challenges the trial court's order granting summary judgment in favor of appellee, Kirkstall Road Enterprises, Inc. (Kirkstall). Jones argues that the trial court erroneously granted the motion for summary judgment because (1) he sufficiently raised a fact issue as to whether Kirkstall was entitled to First Amendment immunity, and (2) he produced clear and specific evidence of each element of his claim for negligence against Kirkstall. We affirm the trial court's order.

## Background

Kirkstall produces a nationally broadcasted reality television show, *The First 48*. The show features homicide detectives, and it includes recordings of actual police interviews as well as dramatizations and reenactments of events surrounding the early days of murder investigations. The program at issue in this case aired on June 9, 2014 (the Episode). It involved the Dallas murder of Donovan Reid, a suspected drug dealer. Reid had been shot in his home during what police believed was a robbery by rival drug dealers.

Jones was interviewed by Dallas detectives during their investigation of the Reid murder. Jones is the second person whose police interview is shown in the Episode. His image—like that of the other witness—is blurred, and his voice is altered. Jones relates a conversation he had with Clint Dewayne Stoker, whom police had identified early on as a suspect. Jones explains that Stoker told him details of the robbery and murder. According to Jones, Stoker implicated himself and another man known as "21." Jones tells the detectives, "21 and them . . . they're some killers. Let me tell you the full scoop" and goes on to relate the conversation he had with Stoker.

Jones asserts that immediately after the Episode aired, he and his mother received threats from Stoker and a friend of Stoker's, Shmyron Cooper. Jones reported the threats to the Dallas Police Department, and both Stoker and Cooper were indicted soon afterward for retaliation. But Jones asserts that he continued to be victimized—assaulted, robbed, and threatened—because of his "perceived

depiction" as a "snitch" regarding Reid's murder. Fourteen months after the Episode aired, Jones was shot four times by Michael Scott, a man Jones had known since high school and yet another friend of Stoker's.

Jones filed suit, alleging that Kirkstall was negligent in the editing, production, and release of his image and voice on national television. Kirkstall filed a traditional motion for summary judgment, arguing that it enjoyed First Amendment immunity and that Jones could not prove the elements of his negligence claim. The trial court granted the motion and dismissed Jones's claims. He appeals.

### Discussion

We apply well-known standards in our review of traditional summary judgment motions. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). The movant has the burden to demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49. We consider the evidence in the light most favorable to the nonmovant. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Within the framework of these standards, we review the summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The trial court granted the motion without identifying the basis of its ruling. Accordingly, we

must affirm the order if any of the summary judgment grounds are meritorious. *FM Properties Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex. 2000).

To prevail on his negligence claim, Jones had to establish that (1) Kirkstall owed him a legal duty, (2) Kirkstall breached that duty, and (3) the breach proximately caused his injury. *See Nabors Drilling, U.S.A. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). Kirkstall's motion challenged Jones's ability to prove each of those three elements. We focus here on the requirement of a legal duty owed by Kirkstall to Jones. "A duty represents a legally enforceable obligation to conform to a particular standard of conduct." *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 233 (Tex. App.—Dallas 1993, writ denied). The existence of such a duty is a question of law to be determined by the court. *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008).

Jones's petition alleged that Kirkstall owed him "a duty to exercise reasonable care in the editing, production, and release of [Jones's] image, likeness, and/or voice on national television." Specifically, Jones contends that Kirkstall owed him a duty to present the Episode in a manner that assured (1) his identity was not discernable and (2) he was not falsely portrayed as a confidential informant or a witness who otherwise voluntarily assisted the police in their investigation of Reid's murder.

Kirkstall's motion negated traditional sources of a duty under Texas law. Jones did not attempt to establish a statutory source for the duty he claims. And Texas common law imposes no duty to control the actions of a third party unless a

–4–

special relationship exists between the parties. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017).[1] More specifically, Texas does not recognize a general duty to protect others from the criminal acts of third parties. *Trammell Crow*, 267 S.W.3d at 12. As to a duty owed by a media defendant, Kirkstall asserts that no Texas authority recognizes a duty to avoid negligent editing or production.

Kirkstall relies on a case from this Court addressing whether the media owes a duty to protect persons from a risk of violence arising after a publication: *Orozco v. Dallas Morning News, Inc.*, 975 S.W.2d 392 (Tex. App.—Dallas 1998, no pet.).[2] In *Orozco*, the newspaper published a story concerning the arrest of Natividad Orozco, Jr. as a murder suspect in a drive-by shooting. *Id.* at 393–94. The article included Orozco's name and the street and block number where he lived. *Id.* at 394. The day the article circulated, the family with whom Orozco lived began receiving telephoned threats of retaliation for the murder, and gunshots were fired at the house. *Id.* That evening, when Orozco's sister answered the door, she and her son were shot; her wounds were fatal. *Id.* The family sued, alleging that the newspaper was

---

[1]  Jones does not contend that such a special relationship existed between him and Kirkstall.

[2]  Kirkstall also relies on *Way v. Boy Scouts of America*, 856 S.W.2d 230 (Tex. App—Dallas 1993, writ denied). In that case, the plaintiff was the mother of a twelve-year-old boy who was killed when the rifle he and friends were playing with accidentally discharged. *Id.* at 232. She sued, alleging that her son had read a supplement about shooting sports published in *Boys' Life* magazine shortly before the accident and blaming the supplement for causing his death. *Id.* We concluded that the appellees—the supplement's publishers and an advertiser—had no duty to refrain from publishing the supplement or to affix a warning to it. *Id.* at 237. Because *Way* involved commercial speech and accidental conduct of children, we find it less helpful than *Orozco*, which involved a publication relating to crime and subsequent, intentional criminal activity.

negligent in publishing where they lived. We concluded that the newspaper had no duty to refrain from publishing where the arrested man lived. *Id.* at 396. In coming to that conclusion, we stated that we were "directed to no case imposing under Texas law a duty upon a newspaper to refrain from publishing what is a true, public, facially harmless, and newsworthy fact." *Id.* at 395. We remain unaware of any authority imposing such a duty on a member of the media.

Jones argues, however, that Kirkstall's duty can be derived from a traditional risk-utility analysis. Such an analysis requires us to consider a number of factors. In this case we weigh the risk, its foreseeability, and the likelihood of injury to Jones, against the social utility of Kirkstall's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on Kirkstall. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). Of these factors, the most important is the foreseeability of the risk. *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002). A risk of injury is foreseeable if, under the circumstances, one should reasonably anticipate the injury as a consequence of the contemplated conduct. *Way*, 856 S.W.2d at 234.

Jones contends that criminal conduct was a foreseeable result of Kirkstall's false portrayal of him as a confidential informant. But even considering all summary judgment in the light most favorable to Jones as we must, *see Parker*, 249 S.W.3d at 399, we cannot agree that the Episode suggests that Jones was a confidential informant. On the contrary, although the possibility is raised that a confidential

informant for a Gang Unit detective might have information about the murder, the Episode makes clear that the informant refused to talk to the police and that the investigating detectives would need to find information elsewhere. Jones's appearance in the Episode comes a day later and is not tied in any way to the earlier conversation with the Gang Unit detective. We conclude that no reasonable juror could have viewed the Episode and believed that Jones was portrayed as a confidential informant. *See Fielding*, 289 S.W.3d at 848 (reviewing summary judgment evidence by "crediting evidence favorable to [the nonmovant] if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not"). Jones's contention that he was so portrayed fails to raise a genuine issue of material fact and cannot support his foreseeability argument.

As to the general notion that Jones came forward voluntarily to give evidence against Stoker and thereby made retaliation against him foreseeable, the summary judgment evidence is not similarly certain. In his affidavit, Jones states that he did not agree to be interviewed by the police. To the contrary, he states that he was pulled over, handcuffed, and taken to the police station where "detectives implied that if [he] did not cooperate, they would arrest [him] for an unknown crime." At the same time, Kirkstall's evidence includes a statement by *The First 48*'s executive producer that "Kirkstall believed that [Jones] had come forward voluntarily to speak with law enforcement as they attempted to solve the murder of Donovan Reid." The tenor of Jones's interview—"Let me tell you the whole scoop"—does not challenge that

belief. Moreover, Jones's own summary judgment evidence includes an affidavit supporting the retaliation arrest warrant for Cooper, which states that "Complainant Jones is a witness *who came forward* and implicated accomplice Stoker as a suspect in a Capital Murder offense." (Emphasis added.)

This conflict in the evidence, however, does not resolve the summary judgment issue of duty. Kirkstall's contract with the City provided that each episode was submitted for review by the Dallas Police Department (DPD):

> Prior to the airing of each episode of the Program, Producer shall provide the DPD Chief of Police or his designee (the "Representative") with 1 (one) DVD copy of the near final version of Program Materials (the "DVD"). Producer shall allow the Representative 5 (five) business days from receipt of the DVD to review and to notify Producer of factual inaccuracies contained in the Program Materials so that Producer can correct any such inaccuracies and depict the investigation accurately.

Based on this provision, Kirkstall was entitled to rely upon the DPD to correct any inaccuracies within the Episode, including any incorrect suggestion that Jones was a willing witness. Thus, for our limited purposes, it does not matter whether Jones "came forward" to give information about the murder. The DPD—not Kirkstall— knew the circumstances under which Jones was interviewed. Any obligation to prevent inaccuracies was the DPD's, not Kirkstall's.

Kirkstall's summary judgment evidence establishes that it was never informed of threats made to Jones or to his mother. It was never informed by Jones or the DPD of any mistreatment or potential risk of injury to Jones. Nor had the broadcast of any

other episode of *The First 48* ever been followed by retaliatory conduct.[3] We cannot conclude that Jones's appearance on the Episode engendered a risk that would be foreseeable to Kirkstall. Likewise we cannot conclude that there was a likelihood Jones would be shot more than a year later because of the manner in which Kirkstall edited and produced the Episode.

While we conclude the likelihood of injury was low in this case, the utility of Kirkstall's programming was significant. Although we need not reach Kirkstall's immunity ground for summary judgment, we do consider the First Amendment's impact on our risk-utility analysis. *See Orozco*, 975 S.W.2d at 396. Jones dismisses the relevance of First Amendment concerns in this case, distinguishing between what it calls Kirkstall's "scripted, dramatized, inaccurate, and for-profit reality television show" and a news outlet. However, it is settled that entertainment programs, as well as news programs, enjoy First Amendment protection. *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 578 (1977). We have acknowledged "society's keen interest in a press free to report newsworthy facts" as well as the social utility of crime reporting. *Orozco*, 975 S.W.2d at 396, 397. If we were to place the burden to

---

[3] The program's executive producer testified:

> Kirkstall is not aware of any repercussions suffered by witnesses, and certainly no shootings that have occurred as a result of a witness appearing in an episode of *The First 48*. Since its inception in 2004, *The First 48* has broadcast over 500 murder investigations. In that time, Kirkstall is not aware of any violent acts of retaliation against witnesses that occurred as a result of them appearing, whether fully recognizable as themselves or with their identities obscured, in *The First 48*.

Jones does not dispute this testimony.

prevent the kind of unforeseeable injury that befell Jones in this case on the media, the result would be a significant infringement on its Constitutional protections when reporting matters of public interest.

Given the facts of this case, we conclude that the remote possibility of a violent retaliation against Jones did not create a duty on the part of Kirkstall to refrain from editing and producing the Episode as it did. *See Greater Houston Transp. Co.*, 801 S.W.2d at 525. The balance of the actual risk of harm presented and the burden of preventing that harm weighs in favor of Kirkstall.

Finally, Jones argues that even if Kirkstall originally bore no duty to protect him from identification, it actually assumed that duty by disguising his image and voice in the first place. He contends that having undertaken that effort, Kirkstall was required to perform without negligence. To that end, Jones declares that Kirkstall's blurring of his image and altering his voice shows that it "knew that publishing Jones'[s] identity created a high risk and likelihood of harm, and very specifically, the high risk of retaliation against Jones by third parties who were at the center of the episode created by [Kirkstall]." There is no summary judgment evidence that supports this assertion concerning Kirkstall's knowledge. Nor is there summary judgment evidence supporting the premise that Kirkstall blurred Jones's image and altered his voice to protect Jones. On the contrary, the only evidence concerning Kirkstall's motive is its acknowledgement that it disguised participants' identities to avoid obtaining releases: its contract with the City required it to secure permission

from each individual before exhibiting any "identifiable image" of that individual. We conclude Kirkstall did not voluntarily assume a legal duty to disguise Jones in the Episode.

Under the facts of this case, we conclude that Kirkstall owed no legal duty to Jones. Accordingly, Jones could not establish an essential element of his negligence cause of action. The trial court correctly granted summary judgment on that ground. We overrule Jones's second issue and, therefore, need not reach his first issue regarding Kirkstall's First Amendment immunity.

## Conclusion

We affirm the trial court's order granting summary judgment in Kirkstall's favor and dismissing Jones's claims.

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE

180592f.p05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

ARKING JONES, Appellant

No. 05-18-00592-CV    V.

KIRKSTALL ROAD
ENTERPRISES, INC., Appellee

On Appeal from the 191st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-16-01794.
Opinion delivered by Justice
Pedersen, III. Justices Reichek and
Carlyle participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Kirkstall Road Enterprises, Inc. recover its costs of this appeal from appellant Arking Jones.

Judgment entered this 29th day of April, 2020.